## SHELLABERGER *v.* SOMMER.

PATENTS; INTERFERENCE PROCEEDINGS; PRIORITY OF INVENTION.

A decision of the Commissioner of Patents in an interference proceeding involving the priority of invention of an improvement in wire fences upon a review of the evidence *reversed.*

No. 24. Patent Appeals. Submitted November 11, 1895. Decided February 3, 1896.

HEARING on an appeal from a decision of the Commissioner of Patents in an interference proceeding. · *Reversed.*

The facts are sufficiently stated in the opinion.

*Messrs. Offield, Towle & Linthicum, Messrs. R. S. & A. P. Lacey,* and *Mr. Chas. E. Brock* for the appellant.

*Mr. W. V. Tefft* and *Mr. H. H. Bliss* for the appellees.

Mr. Chief Justice ALVEY delivered the opinion of the Court:

This is an appeal brought into this court from the Patent Office; from a decision of the Commissioner of Patents made upon an appeal to him in a case of interference. The interference declared was between the claim of Shellaberger, the present appellant, and that of Peter Sommer, John Sommer, and Peter W. Sommer, as to the priority of invention of a certain improvement in the make and structure of a wire fence.

The issue of interference as declared is as follows :

"A wire strip consisting of border strands and a parallel intermediate strand or strands which are connected by interposed zigzag mesh wires, at their angles, by coils engaging corresponding coils in the strands, the intersection of two mesh-wires with the intermediate strand being arranged alternately at regular intervals."

For the trial of this issue there was a considerable volume of evidence produced and several exhibits filed. Upon careful examination, the examiner of interferences, and, on appeal, the examiner in chief, concluded and held that the device or invention in controversy was fully shown to have been made and reduced to practice by Shellaberger, the present appellant, in the spring of 1888, and, consequently, that he was entitled to priority of invention over the Sommers, the present appellees, whose earliest claim of conception was in 1889. On appeal to the Commissioner of Patents in person, these concurrent rulings were reversed, upon the supposed ground that there was a failure of proof that any fence strip of the kind in question was made earlier than that made by the Sommers, and therefore priority of invention was awarded to them.

The question involved is purely one of fact, and it largely depends for its proper solution upon the credit that may be given to the witnesses produced on the part of Shellaberger. The testimony of those witnesses was not deemed credible by the Commissioner of Patents, though there is nothing in the case that would appear to be sufficient, in any direct way, to impeach the veracity of the witnesses testifying for Shellaberger.

The application of Shellaberger was filed in the Patent Office on the 14th of August, 1891, and that of Peter Sommer, John Sommer, and Peter W. Sommer was filed April 24, 1890. In the preliminary statement of Shellaberger, for declaration of interference, it is alleged that he, Shellaberger, " conceived the invention set forth in the declaration of interferance on or about the 15th of October, 1887 ; that on or about the first day of January, 1888, he made drawings of the invention ; that on or about the 15th of January, 1888, he first explained and exhibited the invention to others, and that he made a model, showing such invention, on or about the 15th of January, 1888. That on or about the 15th of January, 1888, he commenced a series of experiments, aided by mechanics skilled in the

construction of machinery, with a view to the erection of machinery to manufacture the strip embodying his invention ; that the first attempt to erect such a machine proved unsuccessful, and that he continued to experiment until the 10th of July, 1891, when he commenced the erection of a machine which proved successful ; that on or about the 15th of December, 1888, he reduced his invention to practice ; and that, having demonstrated that the strip embodying the invention could be successfully manufactured, he applied for a patent on his invention of the date above mentioned." He further states, that since December, 1891, three machines have been employed in the manufacture of the invention. This statement is made under oath by Shellaberger.

As was properly said by the examiner of interferences, the issue framed relates solely to the fence itself, and not to any machine for making it. If it be true that Shellaberger made the fence described in the issue, in 1888, it is quite immaterial how he made it, whether by hand power or by a machine. And if he and his witnesses are to believed, there remains no reasonable ground for doubt that he did make such fence at that time.

In the preliminary statement of the Sommers, made under oath, it is alleged "that they jointly conceived the invention set forth in the declaration of interferences on or about the first day of September, 1888 ; that they made drawings of the invention on or about October 15, 1889 ; that on or about December 1, 1889, they first explained the invention to others'; that no model of the invention in issue has been made ; that they reduced to practice, or, in other words, made the fence on or about March 20, 1890, and that they have since manufactured the fence for use and sale."

It would appear, therefore, according to the allegations of the parties, that Shellaberger was the first to conceive the invention in issue ; the first to make a drawing, and to make an explanation of the invention to others ; while the

Sommers were the first to manufacture the article for commercial use and sale, and the first to apply to the Patent Office for a patent for the invention.    And but for the claim and case made by Shellaberger, there could be no doubt of the right of the Sommers to receive a patent for the invention in issue, upon the proof furnished by them. · But, upon this issue of interference, to be successful, they must overcome the evidence produced by Shellaberger, as to priority of invention and reduction to practice.

The testimony produced on the part of Shellaberger appears to be of such circumstantial nature, and supported by so many unimpeached witnesses, that it is difficult to question its truthfulness and reliability.    Including Shellaberger himself, there are no less than five witnesses who support the allegation of priority of invention, and the fact of reduction to practice by Shellaberger, before conception by the Sommers.    The witnesses who prove these material facts, are Shellaberger himself, his son Edward Shellaberger, Milligan, Clarke and Hall ; and they all had the fullest possible means of knowledge, and speak in the most positive and unqualified terms.

Shellaberger, the appellant, in his own testimony, states the circumstances of the invention, and the manner in which it was reduced to practice.    He says :

" That his first conception of the fence in issue was some time in October, 1887, while traveling in Missouri ; that upon his return to Beaver Falls, in January, 1888, he made sketches embodying his idea, and, with the assistance of his son, made samples by hand ; that he then requested his son to get up an attachment for a machine already built by him, so that his new invention could be manufactured upon it ; that in March or April the machine was provided with the proper attachment, and some five hundred feet of fencing made upon it ; that this amount was not all in one piece or made all at one time ; that, as the machine did not work satisfactorily, a good many short pieces were made ; that his design and intent at that time was not to manufacture

for the market, but to perfect and construct a machine to make the strip in such quantities as to make it a commercial success." He also testifies that, in the spring of 1888, of the wire made by him and embraced in the present issue, there was a piece about a rod and a half long strung upon posts in the yard of the shops of the Hartman Steel Company, where he was employed, in order to test it.

Edward Shellaberger, the son, was superintendent of the fence department in the works of the Hartman Steel Company in the early part of the year 1888, where his father was employed, and he corroborates fully the testimony of his father. He says:

"In the early part of January, 1888, immediately after my father's return from a western trip, he called my attention to some sketches of a wire fence that he had conceived while on his visit. About the same time or a few days after he twisted up some of his fencing by hand, which was probably the middle of January, 1888; and some time in the latter part of January or fore part of February we made an attachment for him to weave his fencing by hand. This attachment was placed on the old picket machine, and I think was ready to operate some time in February or the fore part of March, 1888. After we had made a few pieces of this fencing on this attachment, we stretched up a short piece on the posts outside of the factory building. We built a machine in the summer of 1891 for the purpose of manufacturing this fencing for the market, but as we did not get our factory built until the spring of 1892, there was none of this fencing manufactured and actually sold until the spring of 1892." And this testimony of both father and son, is fully corroborated by the testimony of the witness Milligan, who was also employed in the Hartman Steel Works at the time of the invention and reduction to practice by Shellaberger. Milligan, in his testimony, says:

"That from November 25, 1886, until about July 1st, 1888, he was in the employ of the Hartman Steel Company, at Beaver Falls, Pa.; that some time in January, 1888, Shella-

berger showed and exhibited to him, in the fence depart-ment of said company, as his own invention, a fence strip similar in construction to that shown in a piece of fencing offered in evidence as " Shellaberger's Exhibit Strip ;" that in March or April following he saw a strip of perhaps a rod in length of the same construction stretched upon posts, just outside of the factory building of the Hartman Company, for the purpose of testing it, and that it re-mained stretched for three or four days." He further states, " that at different times during the year 1888 he made strips of this fencing, and thinks that he made as much as five hundred feet of it altogether ; that Shellaber-ger made, perhaps, as much more ; but what became of it he is unable to tell ; that the *greater part made was capable of being put to actual practical use as a field fence,* and that the object in making it at different times was for the pur-pose, as he believes, of getting the strip more perfect ; that what he made was constructed on a machine which Shella-berger brought with him from Ohio when he came to Beaver Falls, it having been altered and improved for that purpose."

In support of the witnesses whose testimony has been quoted, we have the evidence of Clarke and Hall, who give positive evidence of facts, which, if believed, establish be-yond doubt both the invention by Shellaberger and the re-duction of the invention to practice as early as February or March, 1888.

The whole case, then, turns upon the question whether these five witnesses, who swear to positive, affirmative facts, are entitled to credit and should be believed, as against the negative evidence produced on the part of the Sommers, tending, it may be, to produce doubt as to the invention of Shellaberger, and the reduction of the invention to practice by him ? We discover nothing in the case that will justify this Court in discrediting these witnesses, or that leads to the conclusion that they have conspired to fabricate, and to support by their testimony the case of Shellaberger, as

against that alleged by the Sommers. The testimony mostly relied upon to throw doubt upon the case of Shellaberger is that by which an attempt is made to show that the alleged invention of Shellaberger was but a surreptitious appropriation of the prior invention of the Sommers. But such an imputation would seem to be entirely without foundation in the proof. It is not supported by any positive proof in the case, and there is no such state of circumstances shown as would justify the inference that Shellaberger's claim had such dishonest origin. If his witnesses are believed, they completely repel all such imputation.

It is also urged, as a circumstance calculated to throw discredit upon the claim of Shellaberger, that he did not preserve, and has not produced, the original drawings, specimens of the strip of fence, or the machine upon which it was made; and there is, certainly, considerable force in the objection. But the explanation for the failure to supply this evidence, as given by Shellaberger, is, that the mere sketches were not regarded as of any particular value, and therefore not preserved, and that the strips were lost, and the machine was dismembered and applied to other uses. While the absence of such evidence is always the subject of adverse criticism, yet the failure to produce may be explained, and in this case we think the explanation sufficient.

Whether the invention was reduced to practice by Shellaberger, as alleged by him, the evidence would seem to leave no room for reasonable doubt, that the invention was reduced to practice in the spring of 1888. The evidence shows that some of the strips made were capable of being put to actual practical use on a field fence; and that being proved, further evidence of reduction to practice would not be required. Nor has there been any such delay in making the application to the Patent Office, as should preclude Shellaberger of his right of priority of invention and a patent therefor. In explanation of the delay, he says, that he was without means, and that his design at the time was not

to manufacture for the market, but to construct and perfect a machine to make the strip in such quantities as to make it a commercial success ; and hence he delayed the application to the Patent Office.    There has been no such public use of the invention as to defeat the application for a patent.

The decision of the Commissioner of Patents must be reversed ; and the proceedings and decision of this Court will be certified to the Commissioner of Patents, to be entered of record in the Patent Office, as directed by the statute.

*Decision reversed and proceedings remanded.*